UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-61574-CIV-ZLOCH/ROSENBAUM

ANTHONY STROBRIDGE,

           Petitioner,

v.

WALTER A. McNEIL,
Secretary of the Florida
Department of Corrections,

           Respondent.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court upon Anthony Strobridge's Petition Under 28 U.S.C. § 2254 for Writ of *Habeas Corpus* by a Person in State Custody [D.E. 1], referred to me by the Honorable William J. Zloch for appropriate disposition or report and recommendation of all matters in the case. [D.E. 3]. I have carefully considered Strobridge's Petition, the other filings supporting and opposing the Petition, and the case file. Based on my review, I recommend that the Petition be denied.

### *I. Background*

### A. Offense Conduct

On October 31, 2002, Petitioner Anthony Strobridge ("Strobridge" or "Petitioner") and another man, Michael Clemmons ("Clemmons"), went to the home of victim Stanley Jean-Baptiste's ("Baptiste") mother. Tr. at 333, 337, 339.[1] Upon their arrival, Strobridge and Clemmons banged on

---

[1]   For ease of reference, this Report and Recommendation cites to the page numbers of the trial transcript ("Tr.") contained in Docket Entry 6-3 through Docket Entry 6-13, rather than the CM/ECF stamped page numbers.

the door of the house in an effort to confront the residents about a sexual encounter that had occurred earlier in the evening between Strobridge's sister LaShandra and an unknown young man.  *Id.*; Tr. at 531-35.  Baptiste was not at the home, but when his mother answered the door, Strobridge stated that he was looking for someone named "James" – the man who had had the sexual encounter with Strobridge's younger sister.  Tr. at 333, 335, 505.  During the confrontation, Strobridge and Clemmons broke windows located at the front of Baptiste's mother's home.  Tr. at 339-40.  While the altercation took place, Baptiste's brother called the police, and Baptiste's mother went to get Baptiste, who was staying at his girlfriend's house that evening.  Tr. at 335, 340, 502, 506.

In the morning, Baptiste arrived at his mother's home to clean up the broken glass from the previous evening.  Tr. at 505.  Baptiste's cousins, Marcus Depree ("Depree") and Romell Benjamin ("Benjamin"), along with Depree's friend, Eric Augustin ("Augustin"), were also present while Baptiste cleaned the broken glass at his mother's house.  Tr. at 372, 410, 458-59, 506-07.  While the men were picking up the glass, a red pick-up truck arrived at the house, driven by a man known as "Pokey."  Tr. at 365, 373-76, 508.  Pokey did not exit the truck, but instead, asked for "James," the man who had had sexual intercourse with Strobridge's younger sister.  Tr. at 374, 511-12.  When all of the men denied being James, the driver of the truck allegedly told Baptiste that when he came back, he would deal with Baptiste.  Tr. at 376-77, 514-15, 413, 461-62.  The red truck then left the scene but returned approximately five minutes later.  Tr. at 379, 414-15, 462, 517.

According to Baptiste, Depree, and Benjamin, the same man who had been there earlier, known in the neighborhood as "Pokey," came back driving the same red truck.  Tr. at 379-81; 464, 508, 517.  This time, however, Pokey exited the truck with a handgun wrapped in a small, white towel.  Tr. at 464, 517-18, 520.  Pokey fired four shots.  Two hit Baptiste, who attempted to flee.

Tr. at 415-17, 464-67, 521-22.  After striking Baptiste, the gunman  aimed at Depree, who was sitting in a car at the scene and had witnessed the shooting of his cousin, Baptiste.  Tr. at 418, 467-69.  Because Depree was able to duck down in the car, the shot directed at him through the windshield did not strike Depree.  *Id.* Tr. at 383.

The police arrived at the scene and spoke with Depree and Benjamin.  Tr. 572.  A detective also spoke with Baptiste at the hospital.  Tr. at 570-72.  The three men identified the shooter as "Pokey," but they told police that they were not aware of the shooter's actual name.  *Id.*; Tr. at 574.  Later, a detective presented the witnesses with photographic arrays, and Strobridge was identified by Baptiste, Depree, and Augustin, but not Benjamin.  Tr. at 580-87.

A warrant for Strobridge's arrest was issued on the day of the shooting.  D.E. 6-1 at 42-3.  Subsequently, on December 30, 2002, the State charged Strobridge by way of information filed in the Seventeenth Judicial Circuit, in and for Broward County, Florida, with one count of attempted murder in the first degree of Baptiste (Count I) and one count of aggravated assault with a firearm on Depree (Count II).  *Id.* at 44-5.

**B. Trial Court Proceedings**

Beginning on June 23, 2003, the Broward County Circuit Court ("trial court") held a four-day jury trial on the charges against Strobridge, during which Gerald Cunningham ("Cunningham" or "trial attorney") served as Strobridge's trial counsel. Tr. at 1-700.  The trial was conducted before the Honorable Ana I. Gardiner ("Judge Gardiner").  *Id.*  Following opening statements, the prosecution called various witnesses, including Baptiste, Benjamin, Depree, Augustin, and one of the detectives assigned to the case.  Baptiste, Benjamin, Depree, and Augustin's eye-witness accounts of the shooting were all consistent, and all of the witnesses provided the same physical

3

description of the shooter – a light-skinned, black male fitting Strobridge's physical description. Baptiste, Depree, and Augustin also testified that they selected Strobridge's picture from a photographic line-up presented to them by police.  Tr. at 386, 423, 460-73, 529.

Furthermore, during trial, Sergeant Thomas Palmer ("Palmer") testified that at the time of the shooting, he was assigned as a detective to investigate the case.  Tr. at 568-69.  Palmer explained that he first made contact with Baptiste in the emergency room, where Baptiste was conscious and able to speak with Palmer.  Tr. at 570.  According to Palmer, during this encounter, Palmer took a sworn taped statement from Baptiste regarding the shooting.  *Id.*  Baptiste told Palmer that a person nicknamed "Pokey" had shot him and further described the shooter as a light-skinned, black male who was five-foot-nine to six feet tall, weighed 145 to 165 pounds, and had gold teeth.[2]  Tr. at 571-72.

Palmer further testified that after completing the taped statement of Baptiste, he returned to the crime scene and spoke separately with Depree and Benjamin.  Tr. at 572.  As with Baptiste, Palmer recorded his interviews with Depree and Benjamin.  *Id.*  Palmer stated that both Depree and Benjamin's renditions of the incident were similar to the statement given to Palmer by Baptiste.  Tr. at 573.  According to Palmer's testimony, Depree described the shooter as a light-skinned, black male who was approximately five feet, nine inches tall, with gold teeth, and perhaps a beard or mustache.  Tr. at 573.  Benjamin gave a description of the shooter that was consistent with those provided by Baptiste and Depree.  Tr. at 574.

Later in his testimony, Palmer stated that during his investigation, he also spoke with

---

[2]    During their testimony, Benjamin and Depree also told a detective that at the time, they he did not know the shooter's real name, but he knew that his nickname was "Pokey."  Tr. 386, 464.

Strobridge's mother, Martha Ann Bennett ("Bennett"), asking her if she knew who "Pokey" was. Tr. at 576.  Palmer testified that Bennett informed him that "Pokey" was her son and provided his real name as Anthony Strobridge.  Tr. at 576.  Bennett clarified that "Pokey" was a nickname that Strobridge had been given as a baby.  Tr. at 576-77.

After speaking with Bennett and learning that "Pokey" was Strobridge's nickname, Palmer returned to the Broward Sheriff's Office, where he assisted an analyst in assembling a photographic line-up containing a picture of Strobridge.  Tr. at 577.  While on the stand, Palmer described the line-up as including images of black males similar to Strobridge in age and physical appearance.  *Id.* Palmer further testified that after he put three photo line-ups together, he returned to the hospital, where Baptiste had been admitted under a fictitious name.[3]  Tr. at 578.  Although Palmer had not made arrangements to meet Depree and Benjamin there, when Palmer returned to the hospital, he saw them exiting the emergency room.  Tr. at 579.  Depree and Benjamin had attempted to, but had not been able to, see Baptiste.  Tr. at 580.  Palmer testified that he spoke with Benjamin first, several feet away from Depree.  *Id.*  At that time, Palmer presented the photo line-up to Benjamin, but he was unable to identify anyone as the shooter.  *Id.*

After meeting with Benjamin, Palmer showed the photo line-up to Depree separately.  Depree immediately identified Strobridge's picture as a photograph of the man who had shot Baptiste and who had attempted to shoot Depree.  Tr. at 581-82.  Palmer testified that he did not inform either Benjamin or Depree of the names of the suspects contained in the line-up.  Tr. 582.

Following his meeting with Benjamin and Depree, Palmer visited Baptiste's hospital room,

---

[3]   Palmer explained that because he had not yet identified the suspect, he contacted the hospital and had Baptiste registered under a fictitious name so that no one was permitted to see Baptiste.  Tr. at 578-79.

5

where he showed Baptiste a photographic line-up containing six pictures of black males who were similar in age, height, and facial appearance. Tr. at 584. Palmer advised Baptiste (as he had done with Depree and Benjamin) that the suspect may or may not be in the line-up. *Id.* According to Palmer, Baptiste identified the picture of Strobridge as a photograph of the shooter. *Id.* At that time, Palmer had not indicated to Baptiste that Depree was able to identify Strobridge as well. *Id.*

Finally, Palmer testified that he met with Eric Augustin on December 12, 2002, to take a taped statement and to present him with a photographic line-up. Tr. at 586. Palmer stated that he went through the same process that he had with Baptiste, Benjamin, and Depree. Tr. at 587. As Palmer explained, Augustin's statement was consistent with the information provided by the other witnesses. Tr. at 588. According to Palmer, Augustin also identified Strobridge's photograph in the line-up as a picture of the person who had shot Baptiste. Tr. at 587.

Baptiste, Benjamin, Depree, and Augustin were also called to the stand and their testimony during trial was consistent with Palmer's with respect to their description of the shooter, the procedure Palmer used to conduct the photographic line-ups, and their identification of Strobridge (a/k/a "Pokey") as the man who shot Baptiste. Tr. at 373, 384-89, 422-23, 460-72, 526-29.

After the prosecution rested its case, defense counsel moved for a judgment of acquittal as to both counts, but the trial court denied the motion. Tr. at 601. Then, upon inquiry by the court, Cunningham announced that he had an opportunity to speak with his client and that he and Strobridge agreed that it would not be in Strobridge's best interest to call the defendant to the stand to testify in his defense. Tr. at 602. Accordingly, the defense rested. In response to Cunningham's representations, Judge Gardiner questioned Strobridge directly, confirming that he understood that the prosecution had rested and that he had an opportunity to present his case, including the chance

to testify himself if he so desired.  *Id.* at 602-3.  Judge Gardiner further confirmed that Strobridge understood that he also had a right to remain silent and that Strobridge had independently decided not to testify.  *See id*.  During this questioning, Strobridge indicated that he was satisfied with the services of his trial attorney.  *Id*. at 603.  Defense counsel then renewed his motion for judgment of acquittal, which the court again denied.  *Id*. at 604.

After the trial court heard arguments from counsel regarding jury instructions, *see* Tr. at 604-613, both sides presented closing arguments to the jury.  *See id.* at 615-674.  The trial court then gave the jury instructions, and the jury began its deliberations.  *See id*. at 674-694.  During its deliberations, the jury asked to see a portion of Baptiste's deposition.  D.E. 6-1 at 28; Tr. at 692.  The trial court noted that Baptiste's deposition was not entered into evidence and, thus, denied the jury's request.  *Id.* at 692-93.  Instead, the trial court instructed the jury that they were to rely on their own recollection of what the evidence showed during the trial.  *Id.* at 693.  Neither the prosecutor nor defense counsel had an objection to the instruction given to the jury.  *Id.*

Later the same day, on June 26, 2003, the jury returned a guilty verdict against Strobridge as to both Count I for the attempted murder of Baptiste and Count II for aggravated assault on Depree.  D.E. 6-2 at 23-27; *Id.* at 695-97.  Although counsel for Strobridge made on *ore tenus* Motion for New Trial after the jury returned its guilty verdict, Judge Gardiner denied the motion. *Id.* at 698-99; D.E. 6-2 at 31.

On July 2, 2003, Strobridge appeared before Judge Gardiner for sentencing.  Tr. at 701-715. After hearing from various relatives speaking on Strobridge's behalf, Judge Gardiner sentenced Strobridge to life in prison on both counts, with a twenty-five-year (25) minimum mandatory sentence on Count I and a concurrent twenty-year (20) minimum mandatory sentence on Count II.

*Id.* at 712; D.E. 6-2 at 42-47.   Strobridge filed a timely Notice of Appeal with respect to his

conviction and sentencing.  *Id.* at 49.

## C.  Strobridge's Appeals Regarding Sentencing

On December 9, 2003, Strobridge filed a Motion to Correct Sentence with the trial court

pursuant to Florida Rule of Criminal Procedure 3.800(b)(2).  D.E. 6-13 at 30-39.  More specifically,

Strobridge complained that the trial court could not sentence him to more life on Count II,

aggravated assault with a firearm, because the crime is a third-degree felony punishable by only up

to five years in prison.  *Id.*  The trial court had arrived at this sentence after effectively reclassifying

the crime as a second-degree felony, based on the use of a firearm.

After the trial court did not rule on the Motion to Correct Sentence within sixty days,[4] on

March 1, 2004, Strobridge filed his initial brief with the Fourth District Court of Appeal ("Fourth

DCA"), appealing Judge Gardiner's sentence with respect to Count II ("First Sentencing Appeal").

D.E. 6-14 at 14-39.  In the First Sentencing Appeal, Strobridge argued that with respect to Count II,

the trial court erred in enhancing the sentence beyond that allowable for a third-degree felony.  *Id.*

Put simply, Strobridge took the position that the offense of aggravated assault with a firearm could

not be reclassified as a second-degree felony based on the use of a firearm because a firearm is

already an essential element of the offense.  *Id.* at 23.

On December 22, 2004, the Fourth DCA issued a written opinion, reversing the sentence on

the aggravated assault charge and remanding the case to the trial court for correction of Strobridge's

---

[4]     When the trial court does not rule on a Motion to Correct Sentence within sixty days,
the motion is considered denied.  *See* Fla. R. Crim. P. 3.800(b)(1)(B), (b)(2)(B).  On April 22,
2004, the Clerk of the Court certified that "no order granting or denying such motion was
issued."  D.E. 6-13 at 29.

sentence on Count II.  D.E. 6-14 at 3.  In its opinion, the Fourth DCA found that the trial court improperly reclassified Strobridge's aggravated assault offense (Count II) from a third-degree felony to a second-degree felony.  *Id.*  On January 7, 2005, a mandate issued on the Fourth DCA's decision to reverse and remand. D.E. 6-14 at 2; D.E. 6-15 at 43.

Pursuant to the Fourth DCA's remand of the matter, on April 22, 2005, Judge Eileen O'Connor ("Judge O'Connnor") held a hearing with respect to re-sentencing Strobridge on his aggravated assault conviction.  D.E. 6-16 at 17-37.  After hearing from counsel, Judge O'Connor adjusted Strobridge's sentence for Count II, imposing a twenty-year minimum mandatory sentence. D.E. 6-16 at 36; DE 6-15 at 47-48, 51-53.  On the same day, the trial court also denied Strobridge's motions to reduce and mitigate his sentence regarding Count I, the attempted first-degree murder charge.  D.E. 6-15 at 46.

On May 19, 2005, Strobridge filed a Notice of Appeal ("Second Sentencing Appeal") with respect to Judge O'Connor's re-sentencing on the aggravated assault charge.  D.E. 6-16 at 2-3.  In furtherance of his appeal, on September 13, 2005, Strobridge filed another Motion to Correct Sentencing Error, in which he argued that Judge O'Connor improperly imposed a twenty-year minimum mandatory sentence by issuing a judgment that was broader in scope than that directed by the Fourth DCA.  *Id.* at 40-47.  Strobridge argued that the Fourth DCA's opinion made clear that it meant to effectuate re-sentencing without enhancement considerations.  *Id.* at 45.

When the trial court did not rule on his motion within sixty days, on April 5, 2006, Strobridge filed his initial brief with the Fourth DCA, again appealing his sentence with respect to Count II. D.E. 6-18 at 1-17.  Despite Strobridge's contention that he should have been sentenced to no more than five years with respect to Count II, on November 8, 2006, the 4th DCA *per curiam* affirmed

Judge O'Connor's re-sentencing of Strobridge on Count II.  D.E. 6-17 at 3.  The Fourth DCA issued

its Mandate on December 8, 2006.  D.E. 6-17 at 2.

**D. Strobridge's Motion for Post-Conviction Relief Pursuant to Rule 3.850, Fla. R. Cr. P.**

      While the Second Sentencing Appeal was pending, on December 12, 2005, Strobridge filed

a Motion to Vacate and Set Aside Sentence and Motion for New Trial Pursuant to Rule 3.850 of the

Florida Rules of Criminal Procedure ("Initial Motion for Relief").  D.E. 6-19 at 40-75; D.E. 6-20 at

1-59.  The trial court, however, dismissed the Initial Motion for Relief without prejudice for lack of

jurisdiction, on February 8, 2006, due to the pendency of Strobridge's Second Sentencing Appeal.

D.E. 6-19 at 34.  As noted above, on November 8, 2006, the Fourth DCA affirmed the trial court's

re-sentencing of Strobridge and, thus, denied Strobridge's Second Sentencing Appeal.  D.E. 6-17

at 3.  Accordingly, on December 19, 2006, Strobridge re-filed his Motion for Post-Conviction Relief

pursuant to Rule 3.850, Fla. R. Cr. P. ("Second Motion for Relief").  D.E. 6-19 at 30-33.   The

Second Motion for Relief alleged ineffective assistance of counsel by Cunningham on four grounds:

    (1)    The trial attorney was prejudicially ineffective regarding the plea negotiation process in this matter, improperly preventing the defendant from making an informed decision to accept a plea bargain in place of a trial;

    (2)    The trial attorney was prejudicially ineffective in failing to adequately investigate, research, and litigate, in a timely fashion, a motion to suppress identification procedures used in this case;

    (3)    The trial attorney was prejudicially ineffective for his failure to adequately and reasonably communicate with the defendant before the trial of this matter; and

    (4)    The trial attorney was prejudicially ineffective by failing to object and to otherwise preserve for appeal the various incidents of prosecutorial misconduct throughout the course

of the trial.

*Id.*; D.E. 6-19 at 55, 60, 62, 64.

Because the State had not yet responded to the Second Motion for Relief, on April 30, 2007, and again on January 11, 2008, the trial court commanded the State to file its Response to the Second Motion for Relief.  D.E. 6-19 at 28-29.  Thereafter, on January 17, 2008, the State filed its Response to Strobridge's Second Motion for Relief.  D.E. 6-19 at 24-27.  After receiving and reviewing the State's Response, the trial court, on January 22, 2008, denied Strobridge's Second Motion for Relief, announcing that it based its denial on the reasons set forth in the State's Response.  D.E. 6-19 at 22-23.  Strobridge then appealed the trial court's denial of his Second Motion for Relief to the Fourth DCA on January 29, 2008.  D.E. 6-19 at 19.

After considering Strobridge's appeal and the State's response, on February 11, 2009, the Fourth DCA affirmed the trial court's denial of Strobridge's Second Motion for Relief.  *Strobridge v. State*, 1 So. 3d 1240 (Fla. 4th DCA 2009); D.E. 6-19 at 3-6.[5]  In so doing, the Fourth DCA concluded that Strobridge's claims were legally insufficient and that Strobridge had failed to show prejudice.  D.E. 6-19 at 3.  The Fourth DCA  announced, however, that its affirmance was without prejudice to Strobridge's filing of an amended claim alleging a failure to convey a plea offer.  *Id.*

More specifically, with respect to Strobridge's first claim (*i.e.*, that Cunningham improperly prevented him from making an informed decision to accept a plea bargain), the Fourth DCA found that the motion was legally insufficient because the pleading was ambiguous as to whether any plea offer was ever extended, and Strobridge did not set forth the terms of any alleged plea offer.  *Id.*

_____

[5]   The mandate for the Fourth DCA's affirmance issued on March 13, 2009.  D.E. 6-19 at 2.

Similarly, the Court noted that Strobridge's third claim (*i.e.*, that Cunningham was prejudicially ineffective for failing to communicate with him before trial) related to Strobridge's ability to make an informed, intelligent decision regarding a plea offer. D.E. 6-19 at 4. Because Strobridge provided no details of any alleged plea offer, however, the Court announced that it would permit Strobridge to re-allege the allegations in an amended pleading. *Id.*

In its order affirming the trial court's denial of Strobridge's Second Motion for Relief, the Fourth DCA also discussed Strobridge's second and fourth claims. With respect to claim two (*i.e.*, failure to investigate, research, and file a motion to suppress), the Court pointed out that Strobridge never alleged anything impermissibly suggestive about the procedures used by detectives in presenting the photographic line-up to the witnesses. D.E. 6-19 at 4. In fact, the Court pointed out that Strobridge included in his appeal no facts at all surrounding the use of the photographic line-up or the procedure whereby the witnesses selected Strobridge's picture from the photographic line-up. *Id.* Accordingly, the Fourth DCA found claim two to be legally insufficient and concluded that Strobridge failed to demonstrate any prejudice. *Id.*

With respect to claim four (*i.e.*, failure to object to prosecutorial misconduct at trial), the Court noted that prejudice incurred as a result of deficient performance is assessed based on its effect on the results at trial, not on its effect on appeal. D.E. 6-19 at 5. Before the Fourth DCA, however, Strobridge had asserted prejudice in the failure to preserve issues for appeal and not any prejudice occurring at the trial itself. *Id*. at 5-6.

Overall, the Fourth DCA affirmed the trial court's denial of Strobridge's Second Motion for Relief with respect to all claims. D.E. 6-19 at 6. The Court, however, announced that its ruling was "without prejudice to Strobridge filing an amended motion within thirty days of this opinion as to

12

claims one and three regarding the [alleged] failure to convey a plea offer." *Id.* Despite the language

of the Court's order, Strobridge never filed an amended motion.  Strobridge also did not file a

petition for certiorari review with the Florida Supreme Court or with the United States Supreme

Court.

**E.  Federal Habeas Petition**

Rather than amend his Second Motion for Relief, nearly eight months later, on October 2,

2009, Strobridge filed the Petition for Writ of Habeas Corpus ("Habeas Petition") now before this

Court, raising similar claims to those raised in his Second Motion for Relief.  D.E. 1 at 16. As

"Ground I," Strobridge claims that he "was deprived of his constitutional right to effective assistance

of counsel during the plea negotiation phase of [the] case."  D.E. 1 at 29.  This claim mirrors the one

brought by Strobridge in Claims 1 and 3 in his Second Motion for Relief.  Strobridge now claims,

for the first time, however, that the State extended a ten-year prison sentence plea offer to his trial

attorney before trial commenced.  D.E. 1 at 32.  Strobridge asserts that the ten-year plea offer was

never conveyed to him by Cunningham and, therefore, he received ineffective assistance of counsel

due to his trial attorney's failure to convey the plea offer.  *Id.*

Strobridge's Habeas Petition also raises as "Ground II," a rather generic argument:

> The trial attorney was procedurally ineffective for failing to
> adequately investigate and prepare this case for trial, for failing to
> formulate and present a coherent and effective defense in this matter,
> and, ultimately, by failing to properly and reasonably evaluate the
> case, to the prejudice of the petitioner.

D.E. 1 at 42.  In his discussion of Ground II, the only specific argument that Strobridge raises is the

allegation that his trial counsel did not prepare a motion to suppress the identification procedures

used by detectives investigating the shooting or the actual in-court identifications of Strobridge by

the testifying witnesses.  *Id*.  In support of his general argument that Cunningham was ineffective, Strobridge asserts that trial counsel did not come up with an effective trial strategy but instead merely hoped that the jury would "ignore the nature of the case and the evidence from the victims and witnesses, as well as the circumstances and physical evidence, and believe the unsubstantiated fairy tale . . . that 'rival drug lords' were 'framing' Strobridge."  *Id.* at 43.

Respondent Walter McNeil ("McNeil") filed a Response to the Habeas Petition, *see* D.E. 8, along with an appendix containing the record of the state court proceedings.  *See* D.E. 6.  McNeil argues that as a result of Strobridge's decision not to amend his Second Motion for Relief, he has failed to exhaust his state-court remedies, and any further attempt at exhaustion in state court would be futile because the claims are now both time-barred and procedurally barred.  D.E. 8 at 8-12. McNeil emphasizes that Ground I of the Habeas Petition turns on the resolution of questions of fact surrounding whether a plea offer was made and, therefore, exhaustion in the state tribunal should be required.  *Id.* at 10.

With respect to Ground II, McNeil argues that to the extent that the Habeas Petition alleges ineffective assistance of counsel due to investigation, obtaining, and presenting a defense, this basis of relief was not raised in the Second Motion for Relief as a distinct claim and, therefore, has not been exhausted in state court.  *Id.* at 15.  McNeil further urges that to the extent that Ground II concerns pre-trial investigation in more general terms, these allegations were contained in Claim 3 of the Second Motion for Relief, which the Fourth DCA directed Strobridge to amend.  Because Strobridge did not amend, McNeil contends that Strobridge failed to exhaust his state remedies.  *Id.* at 16.  As a result, McNeil contends that Strobridge's Habeas Petition should be denied. *Id.*

Strobridge filed a Reply to McNeil's Response, in which he argues that amending the Second

14

Motion for Relief would have been futile because no facts could have been added or changed.  *See* D.E. 12.  According to Strobridge, the Second Motion for Relief "was extremely detailed, and . . . contain[ed] all of the facts, allegations, issues, and errors" available to him.  *Id.*  at 6.  In this respect, Strobridge contends that he is not asking the Court to review matters that were not raised in the state court system.  Strobridge explains that he read the Fourth DCA's opinion as an end to the state court proceedings and that no further relief would be found in state court.  In addition, Strobridge argues that, due to the lengthy delay at the trial-court level in receiving a response to his Second Motion for Relief and ruling by the trial court, he should not have to re-file another motion at the trial court level.  *Id.* at 7.  According to Strobridge, any amended filing would have been virtually identical to the one previously filed and, thus, he opines that the trial court would have ruled in the same way after a lengthy delay.

Judge Zloch has referred the Habeas Petition to me for a report and recommendation.  *See* D.E. 3.  This matter is now ripe for disposition.

## *II.  Analysis*

### A.  Timeliness of Petition

Strobridge's Habeas Petition is subject to a one-year limitation period, running from the "date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).  This limitation period is tolled for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending."  28 U.S.C. § 2244(d)(2).

Both parties agree that Strobridge's Habeas Petition is timely.  The Court has independently reviewed the record and agrees with the parties that Strobridge filed the Habeas Petition in a timely

fashion. The Fourth DCA affirmed Strobridge's sentence on November 8, 2006, with a mandate issuing on December 8, 2006.[6]  When Strobridge filed his Second Motion for Relief on December 19, 2006, this action tolled the limitations period.  The Fourth DCA affirmed the Second Motion for Relief on February 11, 2009, and Strobridge filed the instant Habeas Petition on October 2, 2009, within the one-year limitations period.

**B.  Strobridge's Request for an Evidentiary Hearing**

In his Habeas Petition, although Strobridge concedes that federal courts generally will not hear new evidence in support of a claim, he argues that he is entitled to such a hearing.  In Strobridge's view, it would be fundamentally unfair to deny his Habeas Petition "without at least according Strobridge an evidentiary hearing on his claims."  D.E. 1 at 27.  Strobridge argues that he must be allowed to develop his ineffective-assistance-of-counsel claims at a federal evidentiary hearing to avoid a "fundamental miscarriage of justice."  In support of this argument, Strobridge relies on *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

The legal standard for determining the scope of a district court's discretion to hold an evidentiary hearing in a habeas corpus case depends on whether the case is subject to the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA").  Where the AEDPA applies, 28 U.S.C. § 2254(e)(2) provides the standard for holding an evidentiary hearing.  For pre-AEDPA cases, the standard set forth in *Keeney* applies.  *Kelley v. Sec'y for the Dep't of Corr.*, 377 F. 3d 1317, 1333-34 (11th Cir. 2004).  The Court finds that the AEDPA applies to the instant matter because Strobridge filed his Habeas Petition well after

---

[6]    In cases like this one, where the petitioner has been re-sentenced or the sentence has been amended, the statute of limitations runs from the date when the modified sentence became final.  *Stites v. Sec'y for Dep't of Corr.*, 278 F. App'x 933, 934-35 (11th Cir. 2008).

AEDPA's 1996 enactment.[7]

Section 2254(e)(2) is specific to those situations in which an evidentiary hearing is requested to develop facts that the petitioner failed to develop in state court. *Id.* at 1337. This section provides,

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, *the court shall not hold an evidentiary hearing on the claim unless* the applicant shows that –
>
> > (A) the claim relies on –
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added). The language of Section 2254(e)(2) expressly limits the circumstances under which a hearing is permissible. *Kelley*, 377 F.3d at 1337.

By its very terms, the statute applies to petitioners who have failed to develop the factual basis of a claim. Thus, the threshold issue is "whether the factual basis was indeed developed in state court." *Williams v. Taylor*, 529 U.S. 420, 431 (2000). If a factual deficiency does exist but the petitioner diligently sought to develop the state court record, he is not subject to the requirements

---

[7]   Strobridge appears to concede that the AEDPA applies to this matter, D.E. 1 at 19, although he argues that the Court should apply the *Keeney* standard to determine whether Strobridge is entitled to an evidentiary hearing.

of § 2254(e)(2). *See id.* at 437. On the other hand, Section 2254(e)(2) applies where a failure to develop the record stems from a lack of diligence, or some greater fault, attributable to the petitioner or his counsel. *Id.* at 432.

Contrary to Strobridge's contention, more than a mere assertion of a "miscarriage of justice" must be satisfied to entitle petitioners to an evidentiary hearing in federal court. The cause-and-prejudice or "miscarriage of justice" tests set forth by Strobridge apply to pre-AEDPA cases in which petitioners seek an evidentiary hearing. In contrast, and as noted by the Supreme Court in *Williams*, prisoners who are at fault for the deficiency in the state court record must satisfy a heightened standard to obtain an evidentiary hearing. *Id.* at 433. Rather than show cause and prejudice, prisoners who have not been diligent must satisfy Section 2254(e)(2)'s provisions. *Id.* In deciding Section 2254(e)(2)'s inquiry, "[t]he question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts." *Id.* at 435. Diligence depends on whether the prisoner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Id.* And diligence in the usual case requires that the prisoner, at a minimum, seek an evidentiary hearing in state court. *Id.* at 437.

The Court finds that an evidentiary hearing is not required in this case. The record is devoid of any indication that Strobridge's claims rely on either a "new rule of constitutional law, made retroactive to cases on collateral review" or on "a factual predicate that could not have been previously discovered through the exercise of due diligence . . . ." 28 U.S.C. § 2254(e)(2). Nor does Strobridge argue that either circumstance is present in this matter. Nothing in the record reveals that Strobridge's Rule 3.850 counsel was precluded from developing the factual basis for any of

18

Strobridge's claims through due diligence.  Here, the facts missing from the Second Motion for Relief were whether a plea offer had in fact been made and, if so, the terms of the offer.  Strobridge's counsel, by simply making a few telephone calls, could have discovered whether such a plea offer was made by the prosecutor before trial and what the terms of the offer were.  Strobridge has not set forth any facts demonstrating that he or his counsel were diligent in uncovering these facts, review of the record does not reveal that such diligence occurred.  Based on the circumstances, I cannot find that Strobridge made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court.

Additionally, no hearing in state court was had in relation to any of the claims for which Strobridge now seeks an evidentiary hearing.  State courts should have the first opportunity to review the claim and provide any necessary relief.  *Id.* As the Supreme Court has stated,

> For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error.  If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met.  *Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state court proceedings.*

*Id.* at 437 (emphasis added).  Based on my review of the record, I recommend that the Court deny Strobridge's request for an evidentiary hearing because he was not diligent in presenting all of the facts to the state court below, despite the opportunity to amend his Second Motion for Relief.

And, with respect to Ground II, even if Strobridge could be deemed to have diligently sought to develop the state court record, he still is not entitled to a hearing in federal court.  Indeed, where

a petitioner is found to be diligent in developing the state court record, this Court may deny the petitioner's request for an evidentiary hearing "if such a hearing would not assist in the resolution of his claim." *Breedlove v. Moore*, 279 F.3d 952, 960 (11th Cir. 2002). Thus, to receive an evidentiary hearing, the petitioner "must demonstrate that he would be entitled to habeas relief on his claim . . . if his factual allegations are proven." *Id.* The court need not hold an evidentiary hearing "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). I find that, for the reasons set forth below, additional factual development would not affect the Court's recommendation with respect to Ground II set forth in the Habeas Petition. For all of these reasons, the Court declines to hold an evidentiary hearing.

## C.  Exhaustion of State Remedies

Federal law mandates that "[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State . . ." 28 U.S.C. § 2254(b)(1)(A). "The rule of exhaustion in federal habeas corpus is rooted in considerations of federal-state comity." *Preiser v. Rodriguez*, 411 U.S. 475, 491 (1973). The requirement prevents conflict between state and federal courts by giving state courts "the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding . . ." *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). The requirement of exhaustion is intended to reduce piecemeal litigation, to protect the state courts' role in the enforcement of federal law, and to prevent disruption of state judicial proceedings. *Rose v. Lundy*, 455 U.S. 509, 514-18 (1982). As the Eleventh Circuit has explained,

The exhaustion doctrine acknowledges, among other things, the

> importance of the state courts in the overall administration of criminal justice by entrusting those tribunals with the interpretation of the federal constitution and the vindication of rights that the constitution secures to those charged with crime.   Indeed, the doctrine, in operation, gives the state courts "an impetus to develop and apply federal constitutional law." *Galtieri v. Wainright*, 582 F.2d 348, 353-54 (5th Cir. 1978) (*en banc*).  Moreover, exhaustion permits the state courts to engage in constitutional adjudication without premature federal court interference.   As the Supreme Court has observed, "[f]ederal intrusions into state criminal [proceedings] frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128 (1982).

*Esslinger v. Davis*, 44 F.3d 1515, 1525 n. 33 (11th Cir. 1995).

Proper exhaustion of a claim must be "serious and meaningful," requiring the petitioner to "afford the State a full and fair opportunity to address and resolve the claim on the merits." *Kelley v. Sec'y for the Dept. of Corr.*, 377 F.3d 1317, 1343-44 (11th Cir 2004) (quoting *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992)).  Merely proceeding through the state courts is not sufficient.  *Id.* (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971)).  "[N]or is it sufficient that all the facts necessary to support the claim were before the state courts in such a way that the state courts or that a somewhat similar state-law claim was made."  *Id.* (citing *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).  Instead, the petitioner must present his claims to the state courts in such a way that the state courts are given the "opportunity to apply controlling legal principles to the facts bearing upon [the petitioner's] constitutional claim."  *Id.* (citing *Picard*, 404 U.S. at 277).  Indeed, a habeas petitioner must do more than "scatter some makeshift needles in the haystack of the state court record.  The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined."  *Id.* at 1345.

The exhaustion requirement also extends to the specific factual theories supporting a

21

petitioner's claim: "For example, habeas petitioners may not present particular factual instances of ineffective assistance of counsel in their federal petitions that were not first presented to the state courts." *Id.* at 1344. Allowing a petitioner to allege an instance of ineffective assistance of counsel in state post-conviction proceedings and then proceed to federal court to allege additional instances would be contrary to allowing the state a full and fair opportunity to address the petitioner's claim on the merits. *Id.* (citing *Footman v. Singletary*, 978 F.2d 1207, 1211 (11th Cir 1992)). "The state would never have the benefit of evaluating the claim using a fully developed set of facts." *Id.* Put simply, "[t]o ensure exhaustion, petitioners must present their claims in this manner of clarity throughout 'one complete round of the State's established appellate review process.'" *Id.* at 1345 (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

By these tests, Strobridge failed to exhaust his state remedies with respect to Ground I of his Habeas Petition. And, no indication exists that it would have been futile[8] for Strobridge to amend his Second Motion for Relief and clarify for the state court that a ten-year plea offer had been extended by the State but never communicated to Strobridge by Cunningham. To the contrary, the Fourth DCA specifically invited Strobridge to amend his motion within thirty days because the Court was uncertain after reviewing Strobridge's appeal whether any plea offer was ever extended, as Strobridge did not set forth the terms of any alleged plea offer. In the Habeas Petition now before the Court, Strobridge attempts to inject new facts with respect to the alleged plea deal so that he may obtain the relief desired. Because Strobridge never allowed the state court the opportunity to

---

[8] Exhaustion is not a prerequisite to habeas corpus if there is "an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B)(i)-(ii). In other words, exhaustion is not required if it would be futile. *Tatzel v. Hanlon*, 530 F.2d 1205, 1206 (5th Cir. 1976). Here, however, that is not the case.

consider these facts, he has failed to exhaust his administrative remedies.

Indeed, a close reading of Strobridge's Second Motion for Relief reveals several ambiguities and inconsistencies that, if clarified, would have enabled the state court to consider granting relief. For example, in the appeal of his Second Motion for Relief to the Fourth DCA, Strobridge argued in Claim I that Cunningham failed to "diligently and effectively negotiate with the State Attorney's Office and [failed] to secure a reasonable and _timely_ plea offer." D.E. 6-18 at 55 (emphasis in original). Later in the same paragraph, however, Strobridge asserted that Cunningham failed to "_communicate_ a plea offer from the State at a reasonable time." _Id._ at 56 (emphasis added). Strobridge's first statement seems to imply that the Cunningham never negotiated a plea bargain on Strobridge's behalf. Accordingly, Strobridge's argument could be construed as asserting that Cunningham's representation of him was ineffective because he failed to secure a plea offer. Strobridge's second statement, however, suggests that Cunningham obtain a plea offer from the State, but Cunningham failed to communicate that offer to Strobridge.

Similar ambiguities continue throughout the Second Motion for Relief. Claim III of the motion, for example, states that Strobridge "was never made aware of . . . plea offers by the State" or "the desirability of [resolving] the charges against him through a negotiated plea." D.E. 6-19 at 63. Claim III later asserts that lack of communication with Cunningham prevented Strobridge from making "an informed decision regarding his choice of a plea bargain, instead of a trial." _Id._ at 63-64. Again, these statements are susceptible to being read to indicate that no plea deal was ever offered. On the other hand, Strobridge's reference to a "choice" suggests that Strobridge was aware of a plea offer, but Cunningham did not provide sufficient counsel regarding the advisability of taking the offer. Thus, the statements that were presented to the trial court and to the Fourth DCA are unclear

23

and, at times, contradictory.  Due to the ambiguity, the Fourth DCA conveyed to Strobridge that it was uncertain as to the claims asserted in Claims I and III.  Accordingly, the Fourth DCA expressly requested Strobridge to clarify whether a plea offer had in fact been communicated to his attorney, and if so, what its terms were.  Despite this request, Strobridge failed to amend his claims, thereby depriving the state court a full and fair opportunity to address Strobridge's claims on the merits.

In stark contrast to the claims presented to the state court, Strobridge's Habeas Petition now alleges for the first time that the State extended a ten-year prison sentence as part of a plea offer, but Cunningham never advised Strobridge of the offer.  Rather, Strobridge contends that Cunningham told him that the state was "'not amenable to plea negotiations' and that, therefore, 'no plea offer had been made.'"  D.E. 1.  Strobridge gives no explanation for failing to include similar details about the alleged plea offer in his Second Motion for Relief.[9]  Instead, he argues that his Second Motion for Relief "was extremely detailed and set forth all of the defendant's issues, objections, and errors."  D.E. 12 at 4-5.  Furthermore, Strobridge claims that the Motion for Relief demonstrates that he "raised and litigated, as much as possible," each issue that is now pending.  *Id.* at 5.

Strobridge's contention is belied by the fact that he now provides this Court with very specific terms of a plea offer that the State allegedly made, which were nowhere to be found in Strobridge's Second Motion for Relief or any other filings before the state courts.  If a ten-year plea deal had been offered, Strobridge could have and should have provided these details to the state court so that it could fully consider Strobridge's ineffective-assistance-of-counsel claim.  Strobridge does not suggest that the details of the plea offer were somehow undiscoverable to him or his appellate

---

[9]   Moreover, Strobridge did not include any affidavits from himself, Cunningham, or the State Attorney's office providing information about the supposed plea offer.

counsel.  And, although Strobridge argues that "[h]e is not asking this court to review new matters," D.E. 12 at 5, the Court finds that this is precisely what Strobridge seeks for this Court to do. Because the state courts were never given the opportunity to conduct a full and fair review of the claim that is now before the Court, I recommend that the Court find that Strobridge failed to exhaust his state court remedies.

It matters not that Strobridge brought a similar state-law claim because ultimately, he did not afford the state court the opportunity to "apply controlling legal principles to the facts bearing upon [his] constitutional claim." *See Kelley*, 377 F.3d at 1343-44.  The facts presented to the state court were not the same as those now set forth to this Court.  Thus, the state court never had the benefit of evaluating the claim "using a fully developed set of facts." *Id.* at 1344.  Strobridge does not refute the fact that the Fourth DCA provided him with the opportunity to amend his Second Motion for Relief to crystalize the claims that he sought to bring with respect to the plea-negotiation process. Instead, he argues that he should not have to endure what he feels would have been a lengthy delay in obtaining a result.  First, Strobridge's unsupported personal opinion alone that the process would have been lengthy does not qualify as a cognizable excuse for failing to exhaust state remedies. Second, in making his argument, Strobridge concedes that a state remedy was available to him. Moreover, significantly, Strobridge does not contend that the state process would have somehow been ineffective to protect his rights.[10]  Overall, due to the circumstances, I recommend that the Court conclude that Strobridge  failed to exhaust his state court remedies because he did not provide facts relevant to his claims as requested by the Fourth DCA.  *See Kelley*, 377 F.3d at 1350 (to

---

[10]     This is not a case in which the state court engaged in a lengthy delay and failed to rule on the merits of Strobridge's motion at the state court level, thus excusing exhaustion.

exhaust the claim sufficiently, petitioner was required to present the state court with the particular legal basis for relief in addition to the particular facts supporting it).

It is further too late for Strobridge to remedy these deficiencies for the independent reasons that Strobridge has missed the two-year limitations period to file and that Strobridge already raised the claims in his first Rule 3.850 Motion for Relief.  Where a petitioner has failed to exhaust state remedies that are no longer available, that failure constitutes a procedural default that bars federal habeas relief unless certain limited exceptions apply.  *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001).  Here, because any further attempts by Strobridge to exhaust his claims in state court would be futile for the reasons discussed above, Strobridge's claims are procedurally defaulted.  *Maples v. Allen*, 586 F.3d 879, 886 (11th Cir. 2009); *McNair v. Campbell*, 416 F.3d 1291, 1305 (11th Cir. 2005) ("It is well established that when a petitioner has failed to exhaust his claim by failing to fairly present it to the state courts and the state court remedy is no longer available, the failure also constitutes a procedural bar."); *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) ("[W]hen it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we . . . treat those claims now barred by state law as [procedurally defaulted with] no basis for federal habeas relief.")

Because Strobridge procedurally defaulted, the Habeas Petition must be denied unless Strobridge can show an exception applies that would allow this Court to consider the habeas petition. Notwithstanding the fact that a claim is procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default or (2) a fundamental miscarriage of justice.  *Maples*, 586 F.3d at 890; *Kelley*, 377 F.3d at 1345.  If either of these exceptions do not apply, non-exhausted claims cannot be raised in federal habeas

petitions.  *Id.*

A petitioner can establish cause if "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Maples*, 586 F.3d at 890 (quoting *Murray v. Carrier*, 477 U.S. 478, 485-86 (1986)).  These types of external impediments include "evidence that could not reasonably have been discovered in time to comply with the rule; interference by state officials that made compliance impossible; and ineffective assistance of counsel at a stage where the petitioner had a right to counsel."  *Id.* (citing *Mize v. Hall*, 532 F.3d 1184, 1190 (11th Cir. 2008)).  To show prejudice, a petitioner must "demonstrate not only that the errors at his trial created the possibility of prejudice but that they worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimensions."  *Galin v. Sec'y of Dep't of Corr.*, 2011 WL 899563 at * 3 (M.D. Fla. Mar 15, 2011) (citing *United States v. Frady*, 456 U.S. 152 (1982)).  In the absence of a showing of cause and prejudice, a federal judge may grant a habeas petition on a procedurally defaulted claim to correct a fundamental miscarriage of justice.  "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent."  *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003) (quoting *Murray v. Carrier*, 477 U.S. 478, 485 (1986)).

Here, Strobridge has not claimed cause and prejudice or a fundamental miscarriage of justice.  Nor, after an independent review of the record, can the Court find such error.  First, with respect to "cause," the Court's consideration of the record has failed to uncover any "objective factor external to the defense [that] impeded the effort to raise the claim properly in state court."  *See Wright v. Hopper*, 169 F.3d 703 (11th Cir. 1999).  Rather, Strobridge's appellate counsel's failure to amend

the Second Motion for Relief resulted in the procedural default.  This action cannot establish cause

for the default because there is no right to post-conviction counsel.  *Maples*, 586 F.3d at 891.

Accordingly, Strobridge cannot show cause for the procedural default.  *See Jimenez v. Fla. Dep't of*

*Corr.*, 481 F.3d 1337, 1344 (11th Cir.), *cert. denied*, 552 U.S. 1029 (2007) ("A defendant cannot base

his cause and prejudice for procedural default on his attorney's performance unless the attorney's

performance was constitutionally ineffective . . . [and a] petitioner cannot establish constitutionally

ineffective assistance of counsel in state post-conviction proceedings because there is no

constitutional right to an attorney in such proceedings."); *Henerdson v. Campbell*, 353 F.3d 880, 892

(11th Cir. 2003) (ineffective assistance of counsel cannot be considered cause for excusing procedural

default where the default occurred in state collateral post-conviction proceeding).

As noted above, where Strobridge cannot show cause and prejudice, he may still survive a

procedural bar and revive his federal habeas claim by demonstrating that this Court's failure to hear

the merits of his claim would result in a "fundamental miscarriage of justice." *Johnson v. Alabama*,

256 F.3d 1156, 1171 (11th Cir. 2001).  The miscarriage-of-justice exception applies "only in the

extraordinary case" when "the principles of comity and finality that inform the concepts of cause and

prejudice must yield to the imperative of correcting a fundamentally unjust incarceration." *House*

*v. Bell*, 547 U.S. 518, 536 (2006) (internal quotations omitted).  The scope of this exception is

exceedingly narrow since it concerns a petitioner's "actual" innocence rather than his "legal"

innocence.  *Johnson*, 256 F.3d at 1171.  Petitioners who assert actual innocence to overcome

defaulted claims must establish that, in light of new evidence, "it is more likely than not that no

reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 537 (citations

omitted).  Put another way, the petitioner must show that "it is probable that, given the new evidence,

no reasonable juror would have convicted him." *Mize*, 532 F.3d at 1195 (citing *House*, 126 S. Ct. at 2077).  To "be credible, a claim of actual innocence must be based on reliable evidence not presented at trial." *Johnson*, 256 F.3d at 1171 (citations omitted).

Here, Strobridge does not argue, and the record does not suggest, that Strobridge is actually innocent.  To the contrary, the evidence overwhelmingly supports the jury's conviction of Strobridge on charges of attempted first-degree murder and aggravated assault.  Additionally, Strobridge has not alleged that new evidence exists that would establish his innocence.  Rather, Strobridge merely argues that a plea deal was offered but not conveyed to him by counsel for his consideration.  Absent any new exculpatory evidence, Strobridge cannot show that no reasonable juror would have convicted him.  Because Strobridge cannot meet the cause and prejudice exception or show that this is an extraordinary case in which the fundamental-miscarriage-of-justice exception applies, the procedural bar stands and Strobridge's Habeas Petition should be denied with respect to Ground I.

**D.  Legal Standards Applicable to Ground II of the Habeas Petition**

Having determined that Strobridge has procedurally defaulted Ground I of his Habeas Petition, the Court addresses the merits of Ground II only.

### 1.      Habeas Corpus

A district court's ability to grant habeas relief to state prisoners was significantly restricted with the enactment of the AEDPA.  Under the AEDPA, federal courts' review of habeas claims is "greatly circumscribed" and "highly deferential to the state courts."  *Crawford v. Head*, 311 F.3d 1288, 1295 (11th Cir. 2002).  These limitations on habeas review are intended "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

When a habeas petitioner's claims were adjudicated on the merits in state court, the federal court's review is "highly deferential to the state court's decision." *Davis v. Jones*, 506 F.3d 1325, 1331 (11th Cir. 2007) (internal quotation marks omitted). In these circumstances, a federal court may grant habeas relief only when the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro*, 550 U.S at 473.

A state-court decision is "contrary to" clearly established federal law if the state court "arrived at a conclusion opposite to that reached by the Supreme Court on a question of law" or "confronted facts that are 'materiality indistinguishable' from relevant Supreme Court precedent but arrived at a different result." *Jennings v. McDonough*, 490 F.3d 1230, 1236 (11th Cir. 2007) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A decision involves an "unreasonable application of" clearly established federal law when the state court (1) "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case," or (2) "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). In addition, any factual determinations by the state courts with respect to the petitioner's claims are "presumed to be correct," and the petitioner bears the burden of rebutting that presumption of correctness by clear and convincing evidence. 28 U.S.C.A. § 2254(e)(1) (West 2006).

To warrant deference under the AEDPA, the state court's decision must reject the petitioner's claims on the merits, but it need not explain its reasons for doing so.  *See Wright v. Sec'y for Dep't of Corr.*, 278 F.3d 1245, 1255 (11th Cir. 2002).  In the instant case, the Florida state courts denied the claims made by Strobridge in Claims 2 and 4 of his Second Motion for Relief on the merits.  Therefore, this Court must evaluate those claims, to the extent they are contained in Ground II of the Habeas Petition, under the AEDPA's "highly deferential" standards.  *Davis*, 506 F.3d at 1331.

### 2.        Ineffective Assistance of Counsel

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel.  *See* U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 684-86 (1984).  To determine whether a habeas petitioner has been denied this right, the Court applies the standards articulated by the Supreme Court in *Strickland*.  *See Gaskin v. Sec'y, Dep't of Corr.*, 494 F.3d 997, 1002 (11th Cir. 2007) (per curiam) ("The clearly established federal law for ineffective assistance of counsel claims was set forth by the U.S. Supreme Court in *Strickland* . . . .").  In general, *Strickland* requires a defendant claiming ineffective assistance of counsel to prove two elements: (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense."  *Strickland*, 466 U.S. at 687.

With regard to deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  Once the defendant identifies counsel's specific conduct that was allegedly unreasonable, the court must decide whether, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  *Id.* at 690.  Judicial review of counsel's performance, however, "must be highly deferential."  *Id.* at 689.  In particular, "[c]ounsel is strongly presumed to

31

have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. As the Eleventh Circuit has explained, the test for determining whether an attorney's performance was deficient is not what "the best lawyers" or even "most good lawyers" would have done, but "only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992); *see also Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (*en banc*) (explaining that for a habeas petitioner to show that his counsel's conduct was unreasonable, he must prove that "no competent counsel would have taken the action that his counsel did take").

Moreover, the court must avoid "the distorting effects of hindsight" and assess the reasonableness of counsel's performance from his perspective at the time of the challenged conduct. *Strickland*, 466 U.S. at 689. In this regard, "strategic choices" made by counsel after thoroughly investigating the relevant law and facts are "virtually unchallengeable." *Id.* at 690; *see White*, 972 F.2d at 1221 ("*Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy."). And "where the record is incomplete or unclear about counsel's actions," the court "will presume that he did what he should have done, and that he exercised reasonable professional judgment." *Chandler v. U.S.*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (internal quotation marks & alteration omitted).

Regarding *Strickland*'s prejudice requirement, the Supreme Court observed that an unreasonable error by counsel does not justify setting aside a criminal judgment when "the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Thus, absent special circumstances not present here, the defendant must "affirmatively prove prejudice" resulting from his counsel's deficient performance. *Id.* at 692-93. Specifically, the defendant must show that "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Establishing *Strickland*'s deficient-performance and prejudice elements "is not easy: 'the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.'" *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002) (per curiam) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc)). If a petitioner makes an insufficient showing on either element, the court need not address the other element. *See Strickland*, 466 U.S. at 697. In light of these standards, the Court reviews the merits of Strobridge's ineffective-assistance claims contained in Ground II of the Habeas Petition.

**E.  Merits of Ground II of the Habeas Petition**

In Ground II of the Habeas Petition, Strobridge argues that his trial attorney provided ineffective assistance by failing to "adequately investigate and prepare this case for trial, [by] failing to formulate and present a coherent and effective defense in this matter, and, ultimately, by failing to properly and reasonably evaluate the case." D.E. 1 at 42. According to Strobridge, at the very least, basic trial preparation would have resulted in the realization by Cunningham that "with the admission of the multiple identifications of Strobridge by the victims and witnesses, the case was not defendable at trial." *Id.* Instead, Strobridge contends that Cunningham did not research or prepare a motion to suppress identification procedures and did not object to the identifications of Strobridge as the shooter. Aside from this more specific contention, the remainder of Ground II asserts, in a generic fashion, that Cunningham ignored the nature of the case and the evidence, failed to make "deliberate choices of trial strategy and tactics," and failed to make reasonable decisions

because he did "virtually no investigation and discovered virtually no information." D.E. 1 at 43-45.

As an initial matter, the Court notes that with respect to the generic allegations contained in Ground II of the Habeas Petition, these arguments were not set forth in the Second Motion for Relief, and, thus, these claims have not been exhausted in the state court. As noted by the Eleventh Circuit in *Kelley*, "habeas petitioners cannot preserve otherwise unexhausted, specific claims of ineffective assistance merely by arguing that their lawyers were ineffective in a general and unspecified way." 377 F.3d at 1344 (citing *Weeks v. Jones*, 26 F.3d 1030, 1044-46 (11th Cir. 1994)). Moreover, even if these claims did not face an exhaustion problem, Strobridge's generic and vague assertions of ineffective assistance of counsel are not enough to apprise this Court of what, precisely, Cuningham did that could be deemed ineffective. While Strobridge asserts that Cunningham failed to investigate and discovered "virtually no information," Strobridge does not suggest what exculpatory or impeaching evidence existed for Cunningham to find and present during the trial of this matter.

Additionally, with respect to Strobridge's vague claim that his trial counsel failed to conduct a "pre-trial investigation," to the extent the term encompasses plea negotiations, these allegations were contained in Claim 3 of the Second Motion for Relief. Because the Fourth DCA invited Strobridge to amend Claim 3 and he failed to do so, Strobridge has failed to exhaust his state court remedies. Accordingly, Strobridge's claim must be denied for the same reasons discussed above with respect to Strobridge's failure to exhaust Ground I. As further noted above, Strobridge's unexhausted claims are both time and procedurally barred, thus Strobridge's Habeas Petition should be denied with respect to any general allegations relating to plea negotiations contained in Ground II.

The only specific, arguably exhausted argument made by Strobridge with respect to Ground

II of his Habeas Petition is that Cunningham should have realized that the admission of the multiple identifications of Strobridge as the shooter by the victims and witnesses made the case "undefendable" at trial. Based on this circumstance, Strobridge contends that Cunningham should have filed a motion to suppress the identification procedures or challenged the testimony about the out-of-court identification. *Id.* While it is true that the victims in this case, along with other witnesses picked Strobridge out of a photographic line-up and testified to this identification during trial, Strobridge fails to set forth how the photographic line-up or witness identifications were unlawful. This argument is similar to that made in Claim 2 of Strobridge's Second Motion for Relief, which was addressed by the Fourth DCA.

In affirming the trial court's denial of Strobridge's Second Motion for Relief, the Fourth DCA previously rejected Strobridge's claim that Cunningham was ineffective by failing to file a motion to suppress the out-of-court identifications of Strobridge made by several witnesses and their identification before the jury. D.E. 6-19 at 4. The Fourth DCA pointed out that Strobridge never alleged anything impermissibly suggestive about the procedures and no facts surrounding the identification procedures were included in Strobridge's appeal. *Id.* As a result, the court found that Strobridge's motion was legally insufficient and failed to show *Strickland* prejudice because Strobridge's contention did not require post-conviction relief unless the identifications would be suppressed. Because no facts were presented to support a motion to suppress the identifications, the Fourth DCA determined that Cunningham was not ineffective for having failed to file such a motion. *Id.*

The record demonstrates that the Fourth DCA's decision to deny this claim was not an unreasonable application of *Strickland*. When a habeas petitioner claims that his counsel was

ineffective for not moving to suppress certain evidence, the petitioner must show "(1) that counsel's representation fell below an objective standard of reasonableness, (2) that the Fourth Amendment claim is meritorious, and (3) that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Zakrzewski v. McDonough*, 455 F.3d 1254, 1260 (11th Cir. 2006) (*per curiam*) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)). Also, because the Court assesses the reasonableness of counsel's performance from his perspective at the time of the challenged conduct, *see Strickland*, 466 U.S. at 689, Cunningham's decision not to seek suppression of the photographic line-up must be examined under the law in effect at that time. *Cf. Smith v. Murray*, 477 U.S. 527, 535-36 (1986) (rejecting argument that counsel was deficient in not appealing trial court's admission of expert testimony because counsel's choice was reasonable under then-existing law).

Here, I recommend that the Court find that no grounds supported a meritorious motion to suppress, and, therefore, the Fourth DCA's decision was not an unreasonable application of *Strickland*. When addressing the constitutionality of a court's decision to admit an out-of-court identification, it is essential to "determine whether the original identification procedure was unduly suggestive." *United States v. Anderson,* 156 F. App'x 218, (11th Cir. 2005) (quoting *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001)). If the reviewing court finds that the procedure was suggestive, it then must consider "whether, under the totality of the circumstances, the identification was nonetheless reliable." *Id; Neil v. Biggers*, 409 U.S. 188, 380-82 (1972).

Accordingly, the Eleventh Circuit has developed a two-part test for determining whether identifications based on a photographic line-up are so unreliable as to violate due process. First, the court must decide whether the identification procedure was unduly suggestive. *Williams v. Weldon*,

826 F.2d 1018, 1021 (11th Cir. 1987); *Neil*, 409 U.S. at 380.  If not, the court ends its inquiry.  If so, the court must then determine, given the totality of the circumstances, whether the suggestive procedure "created a substantial risk of irreparable misidentification at trial."  *Williams*, 826 F.2d at 1021.   The "primary evil to be avoided is a 'very substantial likelihood of irreparable misidentification.'"  *Neil*, 409 U.S. at 381 (quoting *Simmons v. United States*, 390 U.S. at 377, 384 (1968)).

    In the instant matter, although Strobridge contends that Cunningham should have filed a motion to suppress the out-of-court identification of him from the photographic line-up, he does not indicate how the photographic line-up was unduly suggestive or otherwise unreliable.  Nor, in reviewing the circumstances of this matter, do I find that the use of the photographic line-up was unduly suggestive or otherwise unreliable.  Rather, the record reflects that Detective Palmer presented a photographic array of six men to Baptiste and the other witnesses who were present during the shooting.  All of the pictures contained in the photographic line-up were of light-skinned, African-American males who met the same physical description as Strobridge.  Tr. at 577.  In this regard, the males depicted in the photographic line-up were the same approximate age and height as Strobridge with short hair and similar facial appearance to Strobridge.  Tr. at 584.  Additionally, nothing suggests that Strobridge's photograph varied significantly in size from the others or that some other factor drew more attention to Strobridge's photograph than to the others.

    Moreover, the record is devoid of any evidence that the manner in which Detective Palmer administered the photographic line-up was flawed.  Indeed, Palmer testified that he met with each witness separately, under circumstances where each of the witnesses had not talked to each other or to the victim.  Tr. 373, 384, 387-89, 472, 526.   The detective also explained that Baptiste was

37

admitted to the hospital under an alias for his own protection.  Tr. at 578-79.  Accordingly, the other witnesses were not permitted to speak with Baptiste before selecting Strobridge's picture out of the photographic line-up.  *Id.*  Palmer further testified that he did not inform the witnesses of the names of the suspects contained in the line-up and, in fact, advised the witnesses that the suspect may or may not be in the line-up.  Tr. at 582, 584.  Consequently, the photographic line-up was not unduly suggestive or otherwise unreliable, and Cunningham cannot be deemed to have been ineffective by failing to file a motion to suppress.  Under the circumstances, if Cunningham had filed such a motion, the motion would have been found to have been without merit. *See Williams*, 826 F.2d at 1021 (where all members of photographic line-up had similar skin tone and facial characteristics, identification procedures were found not to be impermissibly suggestive).

Likewise, no evidence exists that the in-court identifications of Strobridge should have been objected to by Cunningham.  Nothing about these identifications could be construed to be unnecessarily suggestive or subject to irreparable mistaken identification. *Anderson*, 156 F. App'x at 221 ("the conduct of identification procedures may be so unnecessarily suggestive and conducive to irreparable mistaken identification as to be a denial of due process of law.") (citation omitted).  The prosecutor in this case did not point to the defendant when eliciting identification testimony from witnesses or verbally aid the witnesses in making their identifications.  Rather, the prosecutor merely asked each witness if the shooter was in the courtroom and the witnesses pointed to Strobridge.  As with his contention relating to the out-of-court identifications, Strobridge only vaguely suggests that the in-court identifications were somehow improper.  In this respect, Strobridge fails to specify how the procedure was flawed or designed to suggest to the witnesses whom to identify.  Nothing about this procedure is unduly suggestive, and, thus, it was not

unreasonable for Cunningham not to have objected to the identifications.

Ultimately, Strobridge's counsel was not deficient in failing to file a motion to suppress the out-of-court identifications of Strobridge as the shooter or for failing to object to the in-court identifications.   Consequently, the Fourth DCA's denial of Strobridge's claims was not an unreasonable application of clearly established law.   Accordingly, I recommend that Ground II of Strobridge's Habeas Petition claiming ineffective-assistance regarding these identifications be denied on the merits.

### III.  Conclusion and Recommendation

For the foregoing reasons, I respectfully **RECOMMEND** that Anthony Strobridge's Petition Under 28 U.S.C. § 2254 for Writ of *Habeas Corpus* by a Person in State Custody [D.E. 1] be **DENIED**.

The parties shall have fourteen (14) days from the date of being served with a copy of the Report and Recommendation within which to file written objections, if any, with the Honorable William J. Zloch, United States District Judge.   28 U.S.C. § 636(b)(1).   Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal the factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.   *Resolution Trust Corp. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*,

847 F.2d 745, 749-50 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982)(en banc).[11]

     **FILED AND SUBMITTED** at Fort Lauderdale, Florida, this 5th day of April 2011.

                                 ROBIN S. ROSENBAUM
                                 UNITED STATES MAGISTRATE JUDGE

cc:    Hon. William J. Zloch
       Counsel of Record

---

[11] Decisions rendered by Unit B of the former Fifth Circuit constitute binding precedent in the Eleventh Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).